UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| THEODORE V. KLEINE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 1:17 CV 164 (JMB) |
| | ) |
| JASON LEWIS, | ) |
| | ) |
| Respondent. | ) |

## **MEMORANDUM AND ORDER**

This matter is before the Court of the petition of Theodore V. Kleine for writ of habeas corpus under 28 U.S.C. § 2254. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### I. **Procedural Background**

Petitioner Theodore V. Kleine is presently incarcerated at the Southeast Correctional Center in Charleston, Missouri, pursuant to the judgment and sentence of the Circuit Court of Dunklin County. In December 1970, petitioner was tried for two counts of first-degree murder, but the jury was unable to reach a decision. The case was reset and continued multiple times until April 1976 when it was dismissed for failure to prosecute. On August 7, 2008, petitioner was charged by information with two counts of first-degree murder, § 559.010, Mo. Rev. Stat. (1939) Information [Doc. # 7-4 at 10-11].[1] On December 5, 2009, a jury convicted him of both counts and, on January 13, 2010, the trial court sentenced petitioner to a term of life imprisonment without

---

[1] Materials in the record are cited with the CM/ECF document number and the page number that appears in the red header.

possibility of parole for 50 years.  Judgment [Doc. # 7-4 at 83-84].  The Missouri Court of Appeals affirmed petitioner's convictions and sentence on direct appeal on January 13, 2011.  State v. Kleine, No. SD30313 (Jan. 13, 2011) (Direct Appeal Opinion) [Doc. #7-8].  Petitioner's motion for postconviction relief pursuant to Missouri Supreme Court Rule 29.15 was denied in May 2016 following the submission of deposition testimony.  Postconviction Relief Legal File (PCR L.F.) [Doc. # 7-10 at 84-90].  On April 18, 2017, the Missouri Court of Appeals affirmed the denial of postconviction relief.  Kleine v. State, No. SD34484 (Apr. 18, 2017) (PCR Opinion) [Doc. # 7-15].  On September 18, 2017, petitioner timely filed his § 2254 petition.

## II.      Factual Background[2]

This case arises from the June 20, 1970 murder of Brian Bradford and Mary Lou Seutter beside the St. Francis River near Campbell, Missouri.  On Friday, June 19th, five young people drove from St. Louis to Campbell:  the two victims, petitioner, his younger brother Dennis, and their friend Christopher Wood.  The purpose of the trip was to return Chris Wood to his home in Campbell.  Supp. L.F. [Doc. # 7-5 at 64].  In addition,  petitioner and Dennis went to see their uncle, Oran Hanover, who lived near Wood.  Trial Transcript Vol. 1 (Trial Tr. 1) [Doc. # 7-2 at 111].  The group made the trip in Brian Bradford's car, arriving late in the day.  Id. at 131.  The following day, the group set out in the car to the St. Francis River, but the car got a flat tire along the way and they walked to the river.  Id. at 112.  They spent the afternoon at a bridge, drinking beer and shooting at cans with a high-powered rifle that Brian brought with him.  Id. at 112-13, 131.  Later that afternoon, Dennis returned to the car and changed the flat tire.  He then drove the car to the bridge.  He spent some time there with the others before he and Chris Woods drove back

---

[2] Several witnesses from the 1970 trial were unavailable to testify in 2009 and transcripts of their prior testimony were read to the jury.  These transcripts are found in the Supplemental Legal File (Supp. L.F.) [Doc. # 7-5].

2

to Campbell, leaving petitioner and the victims together at the bridge. Id. at 113-14. Shortly before dark, a local farmer was approaching the bridge when he saw petitioner sitting by the edge of the bridge, holding a rifle. Supp. L.F. at 5. The farmer testified that he "decided it was better not to stop." Id. at 6.

Dennis drove back to the bridge after dark. He did not see anyone there, but he found Brian's rifle lying on the river bank. Trial Tr. 1 at 115. He left the rifle there and turned around and started driving back to Campbell. Id. at 117. He encountered petitioner along the road and picked him up. Dennis asked where Brian and Mary Lou were. Petitioner answered that "Brian got mad and took the rifle and he and Mary Lou went walking . . . to California." Id. Dennis responded that he had found the rifle back at the bridge. The brothers returned to the bridge and petitioner retrieved the rifle from the river bank and put it in the trunk of the car. They then headed to their uncle's home. While he was driving, Dennis wondered out loud about where Brian and Mary Lou could be and petitioner said he had shot them. Dennis thought he was kidding and they both laughed. Dennis again said something and this time petitioner said that he shot them because Brian knocked his glasses off. Id. at 118.

Dennis and petitioner arrived at their uncle's trailer and took the rifle inside. Mr. Hanover told them to clean the rifle so it would not get rusty and sent petitioner to change out of his dirty clothes. He asked where Brian and Mary Lou were and petitioner said that they'd gone to California. Mr. Hanover sent the brothers back to the river with a flashlight to look for them. Supp. L.F. at 37. They returned empty-handed about a half-hour later and Mr. Hanover sent them to the Campbell police station to make a missing persons report. Id. at 39. Police officer Clyde Jacques noticed that petitioner's arm was bleeding. Jacques asked to see his arm, but petitioner refused. Id. at 85. Mr. Hanover also noticed that petitioner's arm was bleeding when he and

3

Dennis returned from the police station.  Id. at 53-54.  In his statement to the investigators, Chris Wood said that petitioner had scratched his arm on the trunk of the car at about 3:00 in the afternoon.  Trial Tr. 1 at 139-40.  At trial in 2009, petitioner testified that he cut his arm on his second trip out with his brother.  According to him, the car had a second flat tire and he cut himself on a jagged piece of metal on the trunk lid.  Trial Transcript Vol. 2 (Trial Tr. 2)  at 228 [Doc. # 7-3 at 48].

On Sunday morning, a fisherman found Brian Bradford's body in the water near the bridge.  Mary Lou Suetter's body was found close by.  Trial Tr. 1 at 106-08.  Officers from the sheriff's department found shell casings, footprints from tennis shoes, and two puddles of blood beneath the bridge.  Officers went to Mr. Hanover's trailer and retrieved the rifle and the clothes and tennis shoes petitioner wore the night before.  Although human blood was detected on petitioner's clothing, the forensic chemist was unable to compare the blood with samples taken from the victims.  Trial Tr. at 173-79.  Petitioner and Dennis were taken into custody.  Petitioner told Trooper Gene Duckworth that he had been alone with Brian and Mary Lou after his brother and Chris returned to Campbell.  According to petitioner, at about 6:00 that evening, Brian and Mary Lou said they were going to walk to California and left.  Supp. L.F. at 15-16.

The State called petitioner's ex-wife Deanne Kleine to testify at the 2009 trial.  She said that she and petitioner began dating in 1994, got married in June 1995, and divorced in 2001.  Trial Tr. 2 at 189.  Before they got married, petitioner told Deanne that he had been prosecuted for a double homicide in Dunklin County.  She testified that she "asked him if he did it and he looked over his shoulders and said yes."  Id. at 190.  After they were married, she "pried about it" and "pressed," to understand whether he had made his "peace with God about it."  He got angry and told her, "Goddamn babe, the motherfucker was suicidal . . . crying he was going to kill himself

4

so I said, boom, you're dead and then [Mary Lou] went to run and I said, boom, you're dead, too."[3]

Id.

### III.     Legal Standard

When a claim has been adjudicated on the merits in state court proceedings, habeas relief is permissible under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), only if the state court's determination:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

A state court's decision is "contrary to" clearly established law if "it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005). "The state court need not cite or even be aware of the governing Supreme Court cases, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" Brown v. Luebbers, 371 F.3d 458, 461 (8th Cir. 2004) (citing Early v. Packer, 537 U.S. 3, 8 (2002)). "In the 'contrary to' analysis of the state

---

[3] The trial court overruled petitioner's assertion of the marital privilege with respect to any statements petitioner made to Deanne Kleine during their marriage. A 1985 statute, § 546.260.2., eliminated the spousal privilege in criminal prosecution for specific crimes, including first-degree murder, when there is a minor victim. Direct Appeal Opinion at 8 n.2. Mary Lou Seutter was 17 years old at the time of her death. Trial Transcript at 15, 17-18, 88. The jury was instructed that it could consider Deanne Kleine's testimony only with respect to the murder of Mary Lou. Direct Appeal Opinion at 7. The appellate court noted that rules regarding the spousal privilege were procedural rather than substantive and thus the version of § 546.260 that was in effect at the time of trial applied, rather than the version in effect at the time of the crime. Id. at 8 n.3.

5

court's decision, [the federal court's] focus is on the result and any reasoning that the court may have given; the absence of reasoning is not a barrier to a denial of relief." Id.

A decision involves an "unreasonable application" of clearly established law if "the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner," Payton, 544 U.S. at 141; Williams v. Taylor, 529 U.S. 362, 405 (2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 406. "Federal habeas relief is warranted only when the refusal was 'objectively unreasonable,' not when it was merely erroneous or incorrect." Carter v. Kemna, 255 F.3d 589, 592 (8th Cir. 2001) (quoting Williams, 529 U.S. at 410–11).

When reviewing whether a state court decision involves an "unreasonable determination of the facts," state court findings of "basic, primary, or historical facts" are presumed correct unless the petitioner rebuts the presumption with clear and convincing evidence. Collier v. Norris, 485 F.3d 415, 423 (8th Cir. 2007) (citations omitted); 28 U.S.C. § 2254(e)(1). Erroneous findings of fact by the state courts do not ensure the grant of habeas relief. Rather, the determination of these facts must be unreasonable in light of the evidence of record. Id.

**IV.   Discussion**

Petitioner asserts two grounds for relief. First, he challenges the State's delay in retrying him after a mistrial was declared in 1970. Second, he asserts that trial counsel rendered ineffective assistance by failing to call witnesses to rebut his ex-wife's testimony that he confessed to committing the two murders.

6

### A. Ground 1: Delay in Trial

Petitioner argues that the State's delay in retrying him violated his right to a speedy trial under the Sixth Amendment and his due process rights under the Fifth Amendment. Petitioner presented both arguments to the Missouri Court of Appeals.

The Sixth Amendment provides in part that: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . ." This speedy trial clause does not apply to the period before a defendant is indicted, arrested, or otherwise officially accused. United States v. MacDonald, 456 U.S. 1, 6 (1982) (citing United States v. Marion, 404 U.S. 307, 313 (1971)); id. at 7 ("[N]o Sixth Amendment right to a speedy trial arises until charges are pending."); see also United States v. Lovasco, 431 U.S. 783, 788 (1977) ("[A]s far as the Speedy Trial Clause of the Sixth Amendment is concerned," a lengthy preindictment delay is "wholly irrelevant."). Here, petitioner challenges the time between the dismissal for lack of prosecution in 1976 and the charge by information in 2008. The Supreme Court has held that the speedy trial guarantee does not apply to the period between the dismissal of charges and recharging. In MacDonald, the Court explained that the Sixth Amendment right is not intended to prevent prejudice to the defense caused by the passage of time — that interest is protected by the Due Process Clause and statutes of limitations. 456 U.S. at 8. Rather, "[t]he speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." Id. "Once charges are dismissed, the speedy trial guarantee is no longer applicable," and the formerly accused "is legally and constitutionally in the same posture as though no charges had been made. He was free to go about

7

his affairs, to practice his profession, and to continue with his life." Id. at 10.  Thus, petitioner does not have a viable claim under the Sixth Amendment's speedy trial guarantee.

Petitioner also asserts that the delay between the dismissal of the original charges and their reinstatement violated his Fifth and Fourteenth Amendment due process rights.  Statutes of limitations "provide the primary guarantee against bringing overly stale criminal charges." Lovasco, 431 U.S. at 789 (citations and internal quotations omitted).  Here, no statute of limitations applied to the first-degree murder charges against petitioner.  Direct Appeal Opinion at 3.  Statutes of limitations, however, are not the only source of protection against pre-indictment delay. Marion, 404 U.S. at 324.  The Due Process Clause requires "dismissal of the indictment if it [is] shown at trial that the pre-indictment delay . . . caused substantial prejudice to [the accused's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused."  Id.; see also Lovasco, 431 U.S. at 790 (proof of prejudice is "a necessary but not sufficient element of a due process claim[;] . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused."); State v. Griffin, 848 S.W.2d 464, 466 (Mo. 1993) ("[T]he test for determining whether pre-indictment delay requires the dismissal of charges is whether 1) the defendant was prejudiced by a pre-indictment delay which 2) was intended by the prosecution to gain a tactical advantage over the defendant.").  "The prejudice shown must be more than the 'real possibility of prejudice inherent in any extended delay; that memories will dim, witnesses will become inaccessible, and evidence will be lost.'" State v. Clark, 859 S.W.2d 782, 786 (Mo. Ct. App. 1993) (quoting Marion, 404 U.S. at 325–26).

Petitioner argued in the Missouri courts that he was prejudiced by the delay in recharging him because the blood stains on his clothes had degraded too much to allow DNA testing.  He asserted that such testing might have proven that it was his own blood on the clothes, rather than

8

Brian's and Mary Lou's, as implied by the State. Appeal Brief at 18-19 [Doc. # 7-6]. The appellate court rejected this argument because there was no information in the record regarding when DNA testing was possible in this case and, perhaps, it would have been impossible to obtain DNA testing from the blood stains as soon as one year after the original dismissal. Direct Appeal Opinion at 3-4. Thus, the blood-stained clothing was only "potentially useful evidence."[4] Where the State suppresses actually exculpatory evidence, a due process violation occurs, regardless of the good or bad faith of the prosecution. Id. at 4; see also Arizona v. Youngblood, 488 U.S. 51, 57 (1988) ("The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.") By contrast, the Missouri Court of Appeals noted, a due process claim based on the State's failure to preserve potentially exonerating evidence requires a criminal defendant to show bad faith on the part of the State. Direct Appeal Opinion at 5 (emphasis added); see also Youngblood, 488 U.S. at 57 (requiring a showing of bad faith when addressing "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."). The Missouri Court of Appeals held that there was no bad faith in this case because "[t]he blood evidence naturally degraded over time to a point that made DNA analysis unattainable." Direct Appeal Opinion at 5.

Petitioner also contended that he was prejudiced by the delay because the State read into the record the prior testimony of deceased witnesses, whose credibility and demeanor the jury could not assess. The Missouri Court of Appeals found that the claimed prejudice did not arise

---

[4] Petitioner did not argue that favorable results on DNA testing, if possible, would have exonerated him, but merely that they would have undermined the State's reliance on conjecture and insinuation. Appeal Brief at 18.

9

above the speculative level and, more important, petitioner failed to show that the delay was intended to gain a tactical advantage over him.  Id. at 5-6.

As the above discussion demonstrates, the State courts properly identified and applied the Supreme Court precedent governing petitioner's claim that the State's delay in filing new charges against him violated his due process rights.  Petitioner cannot establish that he is entitled to relief on his claim in Ground 1.

### Ground 2: Ineffective Assistance of Counsel

Petitioner contends that his trial counsel rendered ineffective assistance by failing to call witnesses to rebut Deanne Kleine's testimony that petitioner confessed to killing the victims.  Petitioner presented this claim in his postconviction proceedings.

To prevail on an ineffective assistance of counsel claim, a petitioner must show that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced thereby.  Strickland v. Washington, 466 U.S. 668, 688 (1984).  With respect to the first Strickland prong, there is a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance.  Id. at 689.  Thus, "counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," and the "burden to show that counsel's performance was deficient rests squarely on the defendant."  Burt v. Titlow, 571 U.S. 12, 22–23 (2013) (quotation marks and citation omitted).  A reviewing court must refrain "from engaging in hindsight or second-guessing of trial counsel's strategic decisions."  Abernathy v. Hobbs, 748 F.3d 813, 816 (8th Cir. 2014) (citation omitted).

To establish the "prejudice" prong, the movant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." Strickland, 466 U.S. at 694. "Merely showing a conceivable effect is not enough; a reasonable probability is one sufficient to undermine confidence in the outcome." Paulson v. Newton Corr. Facility, 773 F.3d 901, 904 (8th Cir. 2014) (citation omitted). Although Strickland requires a showing of both deficient performance and prejudice, a "finding that no prejudice exists is sufficient to conclude that counsel was not constitutionally ineffective — [courts] need not first make a determination regarding deficiency." Holder v. United States, 721 F.3d 979, 987 (8th Cir. 2013).

"Taken together, AEDPA and Strickland establish a 'doubly deferential standard' of review." Williams v. Roper, 695 F.3d 825, 831 (8th Cir. 2012) (quoting Cullen v. Pinholster, 563 U.S. 170, 202 (2011)).

> First, under Strickland, the state court must make a predictive judgment about the effect of the alleged deficiencies of counsel on the outcome of the trial, focusing on whether it is "reasonably likely" that the result would have been different absent the errors. Strickland, 466 U.S. at 696. . . . To satisfy Strickland, the likelihood of a different result must be "substantial, not just conceivable." Id. Under AEDPA, [federal courts] must then give substantial deference to the state court's predictive judgment. So long as the state court's decision was not "contrary to" clearly established law, the remaining question under the "unreasonable application" clause of § 2254(d) is whether the state court's determination under the Strickland standard is unreasonable, not merely whether it is incorrect. [Harrington v. Richter, 562 U.S. 86, 112, 101], 131 S. Ct. 770, 792, 785 (2011). This standard was meant to be difficult to meet, and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at [102].

Williams, 695 F.3d at 831-32. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

Petitioner contends that trial counsel should have called his former girlfriend Lisa Ashe and ex-wife Norma Betz to rebut Deanne Kleine's testimony that petitioner confessed to the murders. He contends that each woman would have testified that petitioner never confessed to them that he had committed the murders.

11

During postconviction proceedings, Lisa Ashe testified that she lived with petitioner between 1985 and 1993. She was subpoenaed to appear at petitioner's second trial but was not called to the stand. Had she been called, she would have testified that petitioner always maintained his innocence while they lived together. PCR L.F. at 43-45. Norma Betz testified that she was married to petitioner between 1972 and 1975. Had she been called as a witness at his second trial, she would have testified that he never talked about this case or confessed to the murders. Id. at 53-54.

Petitioner testified that he discussed calling Ashe and Betz with trial counsel, who told him that their testimony would not be relevant or admissible. Id. at 79. Trial counsel testified that she subpoenaed Ashe and Betz to testify at a sentencing phase in the event that petitioner was convicted of a lesser included offense. Id. at 65, 68. She had not considered asking Ashe to testify to rebut Deanne's testimony because "she was not present when the alleged confession took place. So I didn't see how she could rebut what he told Deanne since she was not there . . ." After consulting with others in her office, she determined that she "couldn't prove a positive with a negative" and so did not call Ashe to provide rebuttal testimony. Id. at 66, 68.

The postconviction court found that the proposed testimony of Ashe and Betz was irrelevant and, further, that "this line of testimony would have been never ending . . . as any individual whom [petitioner] had contact, met or lived with could have been called to state [he] never admitted to the murders." Furthermore, petitioner could not establish that he was prejudiced by trial counsel's decision not to call Ashe and Betz to testify at trial. Id. at 88-89. The Missouri Court of Appeals affirmed, noting that trial counsel's decision not to call Ashe and Betz was a matter of trial strategy. PCR Opinion at 7. "Given the tenuous connection, if any, of this purported

12

testimony to . . . Deanne Kleine's testimony, trial counsel's decision not to call [Ashe and Betz] was not unreasonable." Id.

Petitioner has not established that he is entitled to relief under the "doubly deferential" standard that applies to ineffective-assistance claims. Titlow, 571 U.S. at 15. First, he has not met his burden to show that trial counsel's strategic decision not to call Ashe and Betz to testify was unreasonable. Second, he has not shown that the decision of the Missouri courts was contrary to, or an unreasonable application of, Strickland or that the courts unreasonably applied Strickland to the facts in this case.

Petitioner's claim in Ground 2 will be denied.

\* \* \* \* \*

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the petition of Theodore V. Kleine  for writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Doc. # 1] is **denied**.

**IT IS FURTHER ORDERED** that no certificate of appealability will be issued, because petitioner has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 123 S. Ct. 1029, 1040 (2003) (standard for issuing a certificate of appealability).

A separate Judgment will accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of May, 2020.